IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

I.K., by and through his          :     CIVIL ACTION
parent and educational            :
decision maker, B.K.              :
                                  :
        v.                        :
                                  :
THE SCHOOL DISTRICT OF            :
HAVERFORD TOWNSHIP                :     NO. 12-4066

MEMORANDUM

Dalzell, J.                                    August 14, 2013

        This consolidated matter has its genesis in disputes
between a parent, B.K., and her now twenty-year-old special
education-eligible child I.K.'s (collectively, "plaintiff" or "B.K.")
former school district,[1] the School District of Haverford Township
("the District"), over certain individualized education issues
arising under the Individuals with Disabilities Education Improvement
Act, formerly known as the Individuals with Disabilities Education
Act ("IDEA"), 20 U.S.C. § 1400, et seq.  The precise claims now
before us arise from the District's alleged failure to provide I.K.
with a free appropriate public education ("FAPE") and allegations
that the District discriminated against I.K. on account of his
disability.

        In 2012, following a tortured history and narrative of
inter-party communications at the administrative and federal court
levels, Hearing Officer Linda M. Valentini, Psy.D., CHO ("hearing
officer") issued a final decision on substantive grounds that

_____

[1] On May 20, 2013, B.K. informed us that "B.K. and I.K have

reopened a previously closed due process complaint and ultimately reached the merits of I.K.'s IDEA claims.

Pending are the District's motion to supplement the administrative record and three dispositive motions.  B.K. and the District filed what collectively function as cross appeals of the hearing officer's 2011 and 2012 Decisions below.  B.K. also filed a motion for partial summary judgment on the discrimination claims that are still pending in this case.  On August 5, 2013, we convened an evidentiary hearing to assist us in deciding the District's motion to supplement the record.

For the reasons detailed below, we will grant in part and deny in part the District's motion to supplement the administrative record and motion for summary judgment.  We conclude that although no valid settlement agreement exists between the parties, the District has nevertheless succeeded on its equitable claim that promissory estoppel makes B.K.'s promises to settle I.K.'s IDEA and discrimination claims enforceable under the augmented record.  Therefore, the District is entitled to summary judgment on the basis of the waiver and release -- the affirmative defenses it pled in its answer to B.K.'s complaint in C.A. No. 12-4066.  We therefore affirm

---

recently moved to Reading, Pennsylvania."  B.K.'s May 20, 2013 Ltr.

the hearing officer's 2011 decision but vacate her 2012 decision in its entirety.  Because we conclude that B.K. has waived and/or released the District from liability for the IDEA and discrimination claims she advances in her complaint, we are obliged to deny as moot B.K.'s motion for judgment on the administrative record and motion for partial summary judgment on the discrimination claims.

I.   An Overview of the Parties' Dispositive Motions

The District's motion for summary judgment takes issue with the hearing officer's findings of fact and conclusions of law to the extent she (1) failed to find the existence of a settlement agreement between the parties in July of 2009, (2) lacked authority to issue her April 2012 decision in light of our remand Order, (3) failed to entertain the District's promissory estoppel claim, and, assuming the hearing officer was justified in reaching the merits of B.K.'s claims, she (4) erred in her merits determination.  The District's motion for summary judgment seeks an Order "reversing the Hearing Officer's July 8, 2011 ruling denying the existence of a settlement agreement between the parties."  The District also seeks reversal of the hearing officer's April 18, 2012 ruling on the substance of Plaintiff's claims in its entirety.  District MSJ 4.

Unsurprisingly, B.K.'s response contends that the hearing officer did not err in finding that no settlement agreement existed between the parties. B.K. asserts that the hearing officer had the authority to issue her April 2012 Decision. Although B.K. responded to the District's unclean hands claim, her response (oddly) fails to acknowledge the District's estoppel argument. And, but for one aspect of her merits determination, B.K. contends that the hearing officer's 2012 Decision should be affirmed in full and the District's motion for summary judgment on the discrimination claims should be denied.

By contrast, B.K.'s motion for judgment on the administrative record focuses exclusively on the hearing officer's April 2012 decision. B.K. Mt. J. Admin. Rec. 18 ("the Court should . . . revers[e] the Hearing Officer's legal error requiring Plaintiff I.K. to re-enroll to receive a proposed Individual Education Plan ("IEP"), and otherwise uphold[] the Hearing Officer's decision."). B.K. also filed a motion for partial summary judgment on the liability components of her Rehabilitation Act § 504, 29 U.S.C. § 794 ("Section 504") and Americans with Disabilities Act ("ADA") claims. The District seeks summary judgment based upon its waiver and release contentions premised upon its promissory estoppel argument. District MSJ 45.

## II.  Jurisdiction

The parties' IDEA claims comprise what are effectively cross-appeals of the hearing officer's 2011 and 2012 decisions. Since the hearing officer's final 2012 Decision addressed on substantive grounds "whether [I.K.] received a free appropriate public education'", 20 U.S.C. § 1415(f)(3)(E)(i), and denied the parties portions of the relief that each of them sought, they are both "aggrieved by the findings and decision" and thus they have a "right to bring a civil action . . . in a district court of the United States, without regard to the amount in controversy".  Id. § 1415(i)(2)(A).  In light of our consolidation of four civil actions -- C.A. Nos. 12-4066, 12-4033, 11-6040, and 10-4397 -- we will construe all of the parties' claims of error in the hearing officer's decisions below as if they had raised them collectively in omnibus cross-appeals.

As to the federal discrimination claims under Section 504 and the ADA, we have general federal question jurisdiction pursuant to 28 U.S.C. § 1331.

## III.  Pertinent Facts and Procedural History

The District's motion for summary judgment takes issue with the hearing officer's conclusion of law in her July 8, 2011 Decision,

ODR #00803/09-10 KE ("the 2011 Decision"), that the parties failed to enter into an enforceable contract in July of 2009 because their alleged agreement lacked consideration. We will begin with a survey of the hearing officer's findings of fact pertinent to this issue and we will canvass other facts relevant to the overall procedural history of this controversy.

We proceed under the prescribed modified de novo standard of review under which must "give 'due weight' to the findings of the state hearing officer. . . . [and consider f]actual findings from the administrative proceedings . . . to be considered prima facie correct." Ridley Sch. Dist. v. M.R., 680 F.3d 260, 268 (3d Cir. 2012) (internal quotation marks and citations omitted). If we choose to reject the hearing officer's factual findings, we must explain why we do. Id. "Within the confines of these standards, [we are] authorized to make findings based on the preponderance of the evidence and grant the relief [we] deem[] appropriate." D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 564 (3d Cir. 2010) (citations omitted); 20 U.S.C. § 1415(i)(2)(C)(iii); see also Shore Reg'l High Sch. Bd. of Educ. v. P.S., 381 F.3d 194, 199 (3d Cir. 2004) (describing a district court's burden as "unusual" in that it must make its own findings by a preponderance of the evidence, but nevertheless afford "due weight" to the administrative officer's

determinations).  We have plenary review of the hearing officer's

legal conclusions and the standards she applied in deciding the

claims before her.  D.S., 602 F.3d at 564.

Giving the hearing officer's factual findings the due

weight they deserve under this modified de novo standard of review,

we find no basis to depart from her findings as to the settlement

agreement question.  We reproduce below those facts that she found

in her 2011 Decision that factor into our analysis of her decision

and the lengthy procedural history in this case.

A.  2011 Findings of Fact[2]

---

[2] We reproduce these findings of fact, without citations to
the record and footnotes, as they appear in the hearing officer's
2011 Decision.  H1 Ex. 4 (2011 Decision).
    References to "H1" cite the record in the administrative
proceeding recorded at I.K v. Haverford Township School District, ODR
No. 00803/09-10.  The entire "H1" record appears on the docket in
C.A. No. 10-4397 at docket entry # 30.  "H1 NT" refers to the notes
of testimony in that hearing; "H1 SD-#" refers to a school district
exhibit submitted at that hearing and these are collected at Ex. 10
of the administrative record; and "H1 Ex. 4 (2011 Decision)" refers
to the hearing officer's July 8, 2011 Decision.  References to "H2"
cite the administrative record in I.K. v. Haverford Township School
District, ODR No. 2158/11-12.  The entire "H2" record appears on the
docket in C.A. No. 10-4397 at docket entry # 14.  References to
"Aug. 5, 2013 NT" cite the August 5, 2013 hearing testimony and "Aug.
5, 2013 Def. Ex." cite exhibits entered into evidence at that
hearing.

*       *       *

2. The Parent through her former counsel filed a due process complaint on June 15, 2009. The matter was assigned to Hearing Officer Daniel Myers and scheduled for July 29, 2009.

3. The Parent did not receive or hear from her counsel about any settlement proposal from the District following the filing of the due process complaint.

4. On July 28, 2009 the parties and their respective attorneys held a resolution meeting for several hours. At times the parties and their counsel all met together, at other times the parties met individually with their attorney, and at times counsel met with each other.

5. Counsel for the District wrote down some basic settlement terms which had been discussed in the fashion described above. District counsel then read the terms discussed thus far, and Parent's counsel, who was the Parent's formal legal representative at the time, orally agreed to the terms. None of the participants signed the sheet of paper on which the terms were written.

6. The handwritten notes reflecting some basic items of the proposed agreement do not reflect that there was specific and detailed discussion about elements that would be put into a written agreement, such as a release of civil rights claims, a confidentiality provision, and the necessity for the school board to ratify any agreement. Neither the Parent nor her former attorney recalled that conditions such as these were examined.

7. Believing the parties had come to an agreement in principle, counsel for both the District and the Parent spoke to Hearing Officer Myers on the telephone, asking that the hearing session be canceled and requesting 30 days to finalize the agreement. Hearing Officer Myers canceled the session and agreed to continue the matter for 30 days after which time, if he had

not heard from the attorneys, he would dismiss the case.  He confirmed this by email.

        8.    The Parent left the meeting not believing that there had been a settlement, and/or not being in complete agreement with the proposal.

        9.    The standard retainer agreement between a client and the Parent's former attorney's agency specifically gives the client responsibility concerning the acceptance or rejection of settlement of any claims.

        10.  On September 4, 2009, when 38 days had elapsed, and having heard nothing further, Hearing Officer Myers notified counsel by email that he was dismissing the matter and considered it closed.

            *         *         *

        12.  As of September 4, 2009 the Parent had not signed the settlement agreement.  The Parent has not ever signed a finalized revised copy of the settlement agreement.

            *         *         *

        22.  After attempts to work out [certain] problems [related to the closure of the 2009 due process complaint] were not successful, on March 9 or 10, 2010 Parent's counsel amended the original complaint and submitted a motion to re-open the original due process matter.  The parties held several resolution sessions, and exchanged communication by email, none of which resulted in a resolution of the matter.

            *         *         *

        24.  On March 19, 2010 the District through counsel filed a motion to dismiss, asserting that an agreement had already been reached in principle in July 2009, that the present hearing officer had no authority to reinstitute a prior complaint, that even if she did have that authority it should not be exercised as a six month period to re-file a claim was "completely out-of-step with the emphasis on timeliness regarding these types of

claims", and that a claim for specific enforcement of a contract is a matter of state law over which the hearing officer lacks jurisdiction.

     25. The Parent through counsel filed a response in opposition to the motion. The District filed a reply to the response. The Parent filed a motion for reconsideration.

     26. In a ruling dated June 5, 2010 this hearing officer granted the District's motion to dismiss because the same matter had been dismissed by the previous hearing officer, because the Parent had not taken a timely appeal of that hearing officer's dismissal order and because insofar as the hearing would involve a determination of whether or not an agreement existed between the parties this hearing officer believed that she did not have the jurisdictional authority to decide a contract dispute. Further, on June 5th this hearing officer denied the Parent's motion for reconsideration.

B.   <u>Procedural History</u>

As will be seen, the procedural history of this controversy has been long and complex. Regrettably, we must rehearse it in detail here.

On June 5, 2010, the hearing officer denied B.K.'s request to reopen the 2009 administrative action that had been dismissed by another hearing officer. In her Decision, Hearing Officer Valentini granted the District's earlier motion to dismiss because the same matter had been dismissed by the previous hearing officer, the Parent had not taken a timely appeal of that hearing officer's dismissal

10

order, and the hearing would involve a determination of whether an agreement existed, an issue the hearing officer believed she lacked the jurisdiction to decide.  H1 Ex. 4 (2011 Decision) ¶ 27.

On October 15, 2010, I.K., by and through his parent and educational decisionmaker, B.K., filed Civil Action No. 10-4397 ("the 2010 action") against the District as an appeal from the hearing officer's June 5, 2010 Decision.

On March 21, 2011, we issued a Memorandum, I.K. v. Sch. Dist. Of Haverford Twnp., No. 10-4397, 2011 WL 1042311 (E.D. Pa. Mar. 21, 2011), and held that "it [was] within Hearing Officer [Dr. Linda] Valentini's jurisdiction to determine whether a valid settlement agreement exists".  Id. at *5.  We granted the District's Rule 12(b)(1) motion to dismiss without prejudice and remanded the matter "to Pennsylvania Special Education Hearing Officer Valentini on the issue of whether a valid settlement agreement exist[ed]" between plaintiff and the District.  Id.

Acting pursuant to our remand Order, Hearing Officer Valentini heard the parties' evidence over the course of two days. On July 8, 2011, she issued her 2011 Decision, articulated twenty-seven findings of fact, and concluded that "no settlement agreement exists between the parties."  H1 Ex. 4 (2011 Decision) at 13.  Though

the School District raised a promissory estoppel claim in its written closing argument before the hearing officer in the proceedings related to the 2011 Decision, H1 Ex. 5 at 22, her 2011 Decision failed to address this claim.

On August 30, 2011, within the ninety-day period to file a federal action challenging a hearing officer's ruling in an IDEIA matter, the District initiated Civil Action No. 11-6040 seeking primarily to "[r]eview and reverse the Hearing Officer's order dated July 8, 2011" and "[u]phold the enforceability of the October 15, 2009 written settlement agreement, including Parent's release of all claims as set forth therein". Civ. Action No. 11-6040, Complaint at 25 ("the 2011 action").

On September 19, 2011, after the District had initiated the suit before us, it moved before the hearing officer to dismiss B.K.'s second administrative proceeding in light of the hearing officer's intimation that she would allow the second due process complaint to proceed as if the first-filed action had not been dismissed. In its memorandum of law in support of its motion, the District once again contended that B.K.'s claims were barred by promissory estoppel because "the District acted in reliance upon the representations made by Parent and her attorney that the matter had been resolved." H1 Ex. 3 at 17. The hearing officer denied the District's motion

without explanation, id. Ex. 2, thus implicitly rejecting the District's estoppel argument without reaching it.

The hearing officer then set a merits determination and scheduled hearings. After several days of evidence were presented to the hearing officer in mid-March of 2012, the parties filed post-hearing submissions. H2 Exs. 3-4. In the District's written closing, it raised the promissory estoppel claim for a third time. Id. Ex. 4 at 56-58.

While the parties were engaged in these administrative proceedings, the District filed before us its motion to strike the administrative record, or, in the alternative, motion to supplement the administrative record with Judith A. Gran, Esq.'s (B.K.'s former attorney) testimony about a September 28, 2009 evening conversation that occurred between Gran and B.K. on B.K.'s sister's porch. Though we denied that motion without prejudice in light of the parties' lack of opposition to a mediation before the Honorable Jacob P. Hart, the proceedings before us in C.A. No. 11-6040 the 2011 action stalled after the mediation with Judge Hart failed, but the parties continued to actively litigate the merits of B.K.'s claims before the hearing officer.

On April 18, 2012, the hearing officer issued a Decision on the merits of I.K.'s IDEA and Section 504 claims following seven days of testimony and the introduction of evidence ("the 2012 Decision"). The hearing officer's fifty-four page Decision again failed to mention the District's estoppel claim. On July 16, 2012, we transferred Civil Action No. 11-6040 from our Active docket to our Civil Suspense docket pending the expiration of the ninety-day period the parties had under the IDEA to initiate an action appealing a hearing officer's decision.

Both parties filed new complaints -- Civil Action Nos. 12-4033 and 12-4066 -- which together constitute cross-appeals of different aspects of the 2012 Decision. B.K.'s complaint also raised discrimination claims under Section 504 of the Rehabilitation Act and the ADA. We then consolidated all four civil actions into Civil Action No. 12-4066.

Prior to the Rule 16 conference we had scheduled for October 3, 2012, the District renewed its motion to strike portions of the administrative record, or, in the alternative, to supplement the administrative record. Following that conference we directed the parties to "COMPLETE discovery" by November 9, 2012 and "FILE any motions for summary judgment" by November 19, 2012. Oct. 3, 2012 Order. B.K. filed a timely answer to the District's motion.

In accordance with our Order, the District filed a motion for summary judgment requesting that we reverse the hearing officer's 2011 and 2012 Decisions (essentially granting it the relief it sought in Civil Action Nos. 11-6040 and 11-4033) and dismissing plaintiff's complaint in Civil Action No. 12-4066.  B.K. filed what she styled a "motion for judgment on the administrative record", appealing one aspect of the hearing officer's 2012 Decision on the merits.  B.K. also filed a motion for partial summary judgment on her son's discrimination claims seeking judgment on the issue of liability only.

After the parties completed discovery and submitted fully-briefed motions for summary judgment, we denied in part and denied as moot in part the District's motion to strike portions of the administrative record, or, in the alternative, motion to supplement the administrative record.  We held that we lacked the authority to delete part of the administrative record in an IDEA proceeding and denied as moot the District's request to supplement the administrative record because, despite affording it time to conduct discovery, it failed to proffer any "additional evidence" for our consideration.

The District filed a motion for reconsideration of our Order contending, among other things, that "it had no ability to seek [certain] testimony or engage in any 'discovery' on the IDEA claims absent a specific Court grant of such authority."  Mot. for Reconsideration.

The next day, and before B.K. responded, we granted the District's motion because "our review of our notes from the Rule 16 conference . . . appear[ed] to confirm some ambiguity about the scope of allowable discovery, and though the District should have sought clarification of our earlier Scheduling Order before dispositive motions were filed, we [saw] how the District read our instruction obliging the parties to 'COMPLETE discovery' by November 9, 2012, as permitt[ing] discovery on Plaintiffs' discrimination claims alone, and not on the parties' IDEA claims, as the latter claims are generally determined on the administrative record and not part of an ordinary discovery process".  May 9, 2013 Order ¶ (e) (internal citations omitted).  Accordingly, we granted the District leave to depose Judith A. Gran, Esq., plaintiff's former counsel.

B.K. filed a motion for "modification" of our May 9, 2013 Order that amounted to a motion for reconsideration.  We denied her request but granted her the alternative relief she sought and afforded her leave to proffer her own rebuttal deposition testimony

for our possible consideration in resolving the dispositive motions. May 20, 2013 Order.  We also granted as uncontested movant Gran's motion for a protective order and effectively narrowed the scope of her deposition testimony to the September 28, 2009 conversation she had with her former client, B.K., on the porch of B.K.'s sister's home.

On May 30, 2013, the parties filed supplemental briefing on the issue of whether we should hear this additional evidence and what, if any, import we should ascribe to it.  On June 14, 2013, we sua sponte scheduled an evidentiary hearing so that Gran and B.K. could present testimony about their September 28, 2009 conversation. On August 5, 2013, we convened an evidentiary hearing at which Gran and B.K. testified.

IV.   The District's "Appeal" of the 2011 Decision

The parties do not dispute that the hearing officer's 2011 Decision substantially complied with the narrow scope of our remand Order, but they disagree over the hearing officer's legal conclusion over which we exercise plenary review.  For the reasons that follow, we decline to depart from the hearing officer's factual findings as they bear on the issue of whether the parties' July 2009 "agreement" was supported by consideration.  We conclude that the parties did not

enter into a valid settlement agreement in July of 2009 because their agreement at that time lacked consideration.

In the hearing officer's 2011 Decision, she concluded that "[t]he Parent at no time extended the Considerations[3] sought, particularly a waiver of her child's civil rights discrimination claims, in exchange for the District's original promise." H1 Ex. 4 at 12-13 (footnote added). The District's motion claims that the hearing officer erred in finding a lack of consideration. It proffers a single sentence critique of the hearing officer's analysis: "there was consideration in the District's promise to provide funding in exchange for a release of claims relating to Student's education" at the July 28, 2009 meeting. District MSJ 37 (citing no record evidence). B.K., unsurprisingly, contends that the hearing officer's analysis was correct. She asserts that

---

[3] The parties agree that Pennsylvania law supplies the contract law principles here. Under this governing law, "[c]onsideration is defined as a benefit to the party promising, or a loss or detriment to the party to whom the promise is made," however, "the terms 'benefit' and 'detriment' are used in a technical sense in the definition, and have no necessary reference to material advantage or disadvantage to the parties." Stelmack v. Glen Alden Coal Co., 14 A.2d 127, 128 (1940) (internal citations and quotation marks omitted). Put another way, "[t]he consideration necessary to establish a valid contract, express or implied in fact, must be an act, a forbearance, or a return promise, bargained for and given in exchange for the promise." Thomas v. R.J. Reynolds Tobacco Co., 38 A.2d 61, 63 (Pa. 1944).

18

"consideration, the return promise that the District believed it had bargained for was absent; Plaintiff B.K. at no time extended the consideration sought, particularly a waiver of her child's civil rights discrimination claims in exchange for the District's offer from July 28, 2009."  B.K. Resp. at 5 (citing H1 Ex. 4 at 12-13).

Though the District's argument (unhelpfully) omits any citations to the record and fails to enumerate the facts as we directed it to do, we nevertheless construe its motion as inviting us to depart from the hearing officer's legal conclusions and find from the administrative record that at the parties' July 28, 2009 meeting B.K. indeed agreed to release the civil rights claims against the District through the end of the 2009-10 school year, including the extended school year period.  District MSJ 8.  The record evidence that the District points to does not persuade us to depart from the hearing officer's legal conclusion.  We may affirm the hearing officer's legal conclusion on any ground that the record supports.  See Guthrie v. Lady Jane Collieries, Inc., 722 F.2d 1141, 1145 n.1 (3d Cir. 1983) ("An appellate court may affirm a result reached [below] on different reasons, as long as the record supports the judgment." (citing Helvering v. Gowran, 302 U.S. 238, 245 (1937)));  see also Brightwell v. Lehman, 637 F.3d 187, 191 (3d Cir. 2011)

(holding that an appellate court may affirm the decision below "for any reason supported by the record"); United States v. Agnew, 407 F.3d 193, 196 (3d Cir. 2005) (holding that an appellate court "may affirm on any ground supported by the record" in a situation where factual findings were reviewed for "clear error" and legal conclusions were subject to "plenary review" in light of the "properly found facts").

Specifically, the District contends that at the July 28, 2009 meeting,

> [t]he parties began to formulate specific terms of an agreement, and Ms. Habert wrote these down ([H1 NT 121; H1 SD-1; H1 Ex.4 (2011 Decision) at 3]).  Dr. Burnett and Ms. Habert went down the hall to discuss specific terms, and Ms. Habert wrote down the five items at the top of her notes ([H1 NT 129]). Then Dr. Burnett and Ms. Habert came back into the room ([H1 NT 129]). B.K. and Ms. Gran reviewed each item on the list, and when they said yes to each one, Ms. Habert wrote "ok" next to it ([H1 NT 130; 288]). B.K., Dr. Burnett, and both counsel were together when items 1-5 were discussed and agreed to ([H1 NT 171]).  [fn. 3:  Both Ms. Gran and Ms. Habert agreed that Parent assented to each of the terms on Ms. Habert's notes ([H1 NT 130; 288]). According to B.K.'s attorney, "[w]e went through and noted whether we agreed with each of the provisions. And the okay, I think, was documenting that Ms. [K] agreed to it." ([H1 NT 288]).]
>
> The items that were agreed at that point were as follows:

1.   The District would reimburse the Parent for
            tutoring expenses for the 2008-09 school year in
            the amount of $4,000;
            2.   B.K. would file a homeschooling plan for the
            2009-10 school year;
            3.   The District would pay B.K. for services she
            obtains for Student for the 2009-10 school year;
            4.   The amount the District would pay for the
            2009-10 school year services would not exceed
            $50,000; and
            5.   Parent would execute a release of claims
            against the District through the end of the 2009-
            10 school year, including for the extended school
            year period ([H1 NT 77; H1 SD-1]).

District MSJ 7-8 (footnote four omitted).

        A review of the evidence cited above shows that the scope

of the release was unclear when the parties met on July 28, 2009.

Ms. Habert's handwritten note states only "ok . . . release through

conclusion of 2009-10 school year including", but it stops short of

saying what is actually included in the release.  H1 SD-1.  The

District also cites Habert's testimony that: (1) B.K. and Gran "went

over each [of the five items, including the release].  And when they

said yes to each one, I wrote okay next to it", H1 NT 130:2-5; (2) "I

wrote okay down . . . as [B.K.] indicated her as[s]ent to that item

to confirm it" in the presence of three other people, including her

former attorney, id. at 171:17-19; and (3) Gran's testimony that, to

the best of her recollection, the four adults present "went through

and noted whether we [B.K. and Gran] agreed with each of the

provisions.  And the okay, I think, was documenting that [B.K.] agreed to it", id. at 288:14-17.

While we have no reason to dispute this sequence of events, the District points to no clarifying evidence that addresses the hearing officer's primary concern: "[t]he handwritten notes reflecting some basic items . . . do not reflect that there was specific and detailed discussion about elements that would be put into a written agreement. . . . Neither the Parent nor her former attorney recalled that conditions such as [a release of civil rights claims] were examined."  H1 Ex. 4 (2011 Decision) ¶ 6.

We agree with the hearing officer that the record is ambiguous as to what precisely B.K. agreed to release at the July 28, 2009 meeting.  Although Ms. Habert's testimony below suggests that she read her own terse handwritten note as constituting an agreement to "release . . . parental claims through the '09/'10 school year", it is notable that she merely said "Yes" in response to the District lawyer's deposition question.  H1 NT 77:7-17.  Moreover, the District points to no other record evidence to support the inference that B.K. knew just what she was releasing at the July 28, 2009 meeting.

Under Pennsylvania law, if "the extent of the release to be given in exchange for a settlement . . . was never agreed upon, . . . consideration was thus lacking in the agreement".  Krebs v. United

Refining Co. of Pa., 893 A.2d 776, 785 (Pa. Super. Ct. 2006); see also Lombardo v. Gasparini Excavating Co., 123 A.2d 663, 666 (Pa. 1956) (holding that "in order for there to be an enforceable contract, the nature and extent of its obligation must be certain; the parties themselves must agree upon the material and necessary details of the bargain" and holding that under the facts that a contract was not supported by consideration in part because "the alleged contract was much too indefinite" because "there was no agreement or even discussion as to any of the essential terms of the alleged bargain such as time or manner of performance, price to be paid, or the like").[4]  Since the portions of the record that the District relies on in its consideration-related argument do not alter the hearing officer's legal conclusion as to the uncertain scope of the release as the parties discussed at the July 28, 2009 meeting, we agree with the hearing officer's legal conclusion that B.K. never extended to the District the consideration -- i.e., the release of specifically identified claims -- that the District asserts she did at the July 28, 2009 meeting.  See Fire Ins. Ass'n v. Wickham, 141

_____

[4] While we base our decision here only on the administrative record, our conclusion is fortified by Gran's credible testimony before us on cross-examination that the parties did not then "talk[]

U.S. 564, 580 (1891) (emphasis added) (consideration for a contract "must have been offered by one party, and accepted by the other, as one element of the contract" (citing Kirkpatrick v. Muirhead, 16 Pa. 117, 1851 WL 5753, at *9 (Pa. 1851))). Thus, the absence of consideration here precludes us from finding that the parties entered into an enforceable settlement agreement when they met on July 28, 2009. Walton v. Johnson, 66 A.3d 782, 786 n.3 (Pa. Super. Ct. 2013) ("'It is black letter law that in order to form an enforceable contract, there must be an offer, acceptance, consideration, or mutual meeting of the minds.'" (quoting Jenkins v. County of Schuylkill, 658 A.2d 380, 383 (Pa. 1995))).

Because we agree with the hearing officer that for lack of consideration no enforceable settlement agreement existed between the parties, we will not disturb her July 2011 decision.[5] To the extent the District takes issue with that decision, we do not agree.

---

about the scope of the release at the resolution meeting." Aug. 5, 2013 NT 36:18-19.

[5] Because the record supports this independent basis for affirming the hearing officer's decision below, we need not reach the merits of the District's other arguments alleging error in the hearing officer's factual findings and legal conclusions in her July 2011 Decision. See District MSJ 30.

## V.   The Hearing Officer's Authority to
Proceed Beyond the Issue We Remanded to Her

The District contends that the hearing officer lacked authority to take further action after she complied with the narrow scope of our remand order.  Even though our remand order was silent as to how the hearing officer should proceed after resolving the issue we remanded to her, we hold that she acted within the scope of her authority under the IDEA to act as she did.

Notably, the District does not point to -- and we cannot find -- any provision in the IDEA that strips the hearing officer of the authority to take further action consistent with her power under federal and state law after resolving a narrow issue on remand that does not conclusively resolve the case.[6]  It also bears noting that

---

[6] Our conclusion is supported by Blake C. v. Dep't of Educ., No. 06-335, 2007 WL 1240211 (D. Hawaii Apr. 26, 2007), the sole IDEA case the District cites in its discussion of the hearing officer's post-remand authority.  In Blake C., the Court reasoned that "[t]o the extent there is any question, once the Hearings Officer found that the Impartial Hearing Request was timely filed, the remand order permitted her[, sub silencio,]  to order reimbursement based on her previous finding of a denial of FAPE during the 2004-2005 school year."  Id. at *5 n.6 (brackets and footnote added)).  The Blake C. order remanding a specific question to the hearing officer, like our remand order here, did not expressly authorize the hearing officer to proceed as the statute plainly authorized her.  See Blake C. v. Dep't of Educ., No. 06-335, 2006 U.S. Dist. LEXIS 95493, at *7 ("the court REMANDS this case with instructions to the Hearing Officer to make a factual finding as to the date on which Mother received notice of the

the parties never sought a stay of the then-ongoing administrative

proceedings.  To the contrary, they actively litigated the matter

before her, and so it cannot be said that the hearing officer acted

in violation of any court order.  Indeed, the hearing officer's

conduct after resolving the limited issue we remanded to her appears

to be consistent with the IDEA's strong preference[7] that parties

---

ninety-day statute of limitations" without mentioning any subsequent
steps the hearing officer was authorized to take under the IDEA).

[7]   To be sure, uncertainty exists as to whether the
exhaustion of administrative remedies under the IDEA is necessary for
a federal district court to exercise subject matter jurisdiction over
the merits of an IDEA case. See Chambers ex rel. Chambers v. Sch.
Dist. of Philadelphia Bd. of Educ., 587 F.3d 176, 182 n.5 (3d Cir.
2009) (declining to decide whether the IDEA exhaustion requirement
functions as a waivable affirmative defense or a non-waivable
jurisdictional predicate); see also Muskrat v. Deer Creek Pub. Sch.,
715 F.3d 775, 783-85 (10th Cir. 2013) (noting the split in authority
on the subject, declining to reach the issue, and, in dicta, citing
with apparent approval the Ninth Circuit's holding in Payne v.
Peninsula Sch. Dist., 653 F.3d 863, 867-71 (9th Cir. 2011) (en banc),
that the IDEA exhaustion requirement was not jurisdictional); Coleman
v. Newburgh Enlarged City Sch. Dist., 503 F.3d 198, 204 (2d Cir.
2007) (noting the uncertainty as to whether exhaustion of IDEA claims
is jurisdictional and declining to reach the issue); but see id. at
207-12 (Straub, J., concurring) (reasoning that "federal courts lack
subject matter jurisdiction over IDEA claims that are unexhausted and
that do not meet one of the limited exceptions to the statute's
exhaustion requirement").

      Though B.K. asserted that we lacked subject matter
jurisdiction over the merits of the District's first civil action
(C.A. No. 11-6040) in her first affirmative defense to the complaint,
that issue is now moot in light of the subsequently completed
administrative review proceedings that undeniably vest us with
jurisdiction here.  We also note that B.K.'s jurisdictional defense
could be construed as a failure to exhaust administrative remedies.

exhaust the available administrative remedies on any issues that may be "appealed" to the district court.  20 U.S.C. § 1415(l).

Implicit in both the District's argument that the hearing officer lacked authority to proceed beyond the scope of our remand order and its decision to initiate the 2011 action is the assumption that we had jurisdiction to review the hearing officer's 2011 Decision before she took any further administrative action.  We hold that the District's assumption is mistaken.

We lacked jurisdiction to review the hearing officer's July 2011 Decision until she rendered her final 2012 "decision" on "substantive grounds" that addressed "whether the child [I.K.] received a free appropriate public education'".  § 1415(f)(3)(E)(i); § 1415(i)(1)(A).  Whether I.K. received a FAPE was the precise question left <u>un</u>answered by the hearing officer's 2011 Decision.[8]  At

---

<u>Id.</u> ("The hearing officer is currently hearing the merits of the case . . . . Consequently, the [District's] appeal is premature").

    [8] In contrast, had the hearing officer concluded that a valid settlement agreement existed, this determination would have substituted for a FAPE.  <u>See</u> <u>State ex rel. St. Joseph Sch. Dist. v. Mo. Dep't of Elementary & Secondary Educ.</u>, 307 S.W.3d 209, 214-15 (Mo. Ct. App. 2010) (reasoning that an "IDEA settlement agreement . . . determines the 'free appropriate public education' a child will receive; if enforceable, a settlement will constitute a full and final resolution of an IDEA claim"); <u>see also</u> <u>Ballard v. Philadelphia Sch. Dist.</u>, 273 F. App'x 184, 188 (3d Cir. 2008) ("A parent can waive

most, the District's challenge to the hearing officer's 2011 Decision was an attempt to challenge in federal court a state administrative decision declaring under Pennsylvania law (and in the absence of diversity[9]) that there was no contract between the parties. We thus lack jurisdiction over such a claim. See Bay Shore Union Free Sch. Dist. v. Kain, 485 F.3d 730, 733-36 (2d Cir. 2007).

Even assuming that the District's 2011 civil action could be construed as some form of an interlocutory collateral challenge, the hearing officer's decision was not tantamount to an "appealable" collateral order because it failed to resolve an issue that would have been effectively unreviewable after a final decision -- indeed, our actions here are testament to the reviewability of that issue at a time following her final merits-based decision. See also M.L. v. Frisco Ind. Sch. Dist., 451 F. App'x 424, 426, 428 (5th Cir. 2011) ("There is no statutory provision for a suit seeking interlocutory review of preliminary findings and decisions of the hearing officer" in an IDEA case, nor are certain threshold decisions appealable collateral orders); Massieu v. Reno, 91 F.3d 416, 423 (3d Cir. 1996) ("Congress permitted judicial challenges of [certain] orders . . .

---

her child's right to a FAPE. Fitzgerald v. Camdenton R-III Sch. Dist., 439 F.3d 773, 775 (8th Cir. 2006).").

only to those . . . who have exhausted their administrative remedies.
. . . [The Court of Appeals] refused to condone plaintiffs' attempted
end-run around the administrative process. . . . [and] [we] deny
district court jurisdiction where . . . the challenge . . . is
neither procedural nor collateral to the merits and where application
of the specific statutory provisions would not preclude meaningful
judicial review" (internal quotation marks and citations omitted)),
Eddy v. V.I. Water & Power Auth., 256 F.3d 204, 208 (3d Cir. 2001).
Since the District prematurely filed its 2011 civil action before us
and we never had jurisdiction over the subject matter, the hearing
officer was not divested of her authority to act in conformity with
her obligations to render decisions on substantive grounds during the
pendency of that civil action.  Cf. 20 James Wm. Moore et al.,
Moore's Federal Practice § 303.32 n.37 & accompanying text (3d ed.
current through September 2013 release) ("If the circuit court
acquires no jurisdiction, it follows that the district court loses no
jurisdiction that it otherwise would have" and quoting Ruby v.
Secretary of the United States Navy, 365 F.2d 385, 388 (9th Cir.
1966) ("[i]f, by reason of defects in form or execution, a notice of

---

        9 The uncontroverted record shows that B.K., I.K. and the
District are citizens of Pennsylvania.  B.K.'s May 20, 2013 Ltr.

appeal does not transfer jurisdiction to the court of appeals, then such jurisdiction must remain in the district court; it cannot float in the air")).

Thus, under the facts here, before the hearing officer issued of a final decision she was the only arbiter authorized by Congress and state law to exercise any authority over this case. If she had failed to act as she did, this matter might well have floated in the air of uncertainty about who should act next.[10] We therefore reject the District's contentions to the contrary.

## VI.   The District's Promissory Estoppel Claim[11]

---

[10] In the first filed civil action, we granted the District's factual challenge to our subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1). Our disposition under Rule 12(b)(1) assumed that B.K.'s failure to exhaust was an issue related to our subject matter jurisdiction over B.K.'s complaint. For the reasons stated above, that assumption was unwarranted. But even if our jurisdictional holding was in error, it is of no consequence to the matter before us now because we undeniably have subject matter jurisdiction at this stage and the record has been fully developed.

[11] We have already disposed of the District's contention that a "settlement was reached in July 2009" because of a lack of consideration, and we will not reach its eleventh-hour contention that "there clearly was a meeting of the minds as to the settlement agreement, on September 28, 2009 if not before", Dist. Supp. Br. at 6 (emphasis in original). The District's motion for summary judgment focuses exclusively on the question of whether the parties agreed to a settlement in July of 2009. District MSJ 30 ("B. The Hearing Officer Erred in Finding that There Was No Settlement Agreement Between the Parties in July 2009; The July 2011 Ruling Must Be Reversed"); id. 44 (contending B.K. should be estopped from denying the agreement because "[f]rom July 28, 2009 until B.K. appeared to

As already noted, we remanded the matter to the hearing

officer to determine "whether a valid settlement agreement exists",

I.K., 2011 WL 1042311, at *5, and her July 2011 Decision focused

solely on the issue of whether an enforceable contract existed

between the parties.  Logically, the hearing officer first had to

decide whether an "enforceable agreement" existed before turning to

the District's promissory estoppel claim because (1) that was the

issue we specifically remanded to her, and (2) the issue of

promissory estoppel[12] cannot be reached until there is a finding that

---

disavow the agreement in April 2010, the District believed it had
settled Parent's claims.").  In this quasi-appeal context, the
District advanced its post-July 2009 settlement agreement argument
for the first time in a supplemental brief that it submitted to us
after the parties completed the voluminous summary judgment briefing
in this matter.  This tactic deprived B.K. of the opportunity to
respond to it.  See Kost v. Kozakiewicz, 1 F.3d 176, 182 (3d Cir.
1993); see also Booking v. General Star Mgmt. Co., 254 F.3d 414, 418
(2d Cir. 2001).  Nevertheless, to the extent the District's motion
discusses events post-dating the parties' July 2009 meeting, these
facts and arguments are plainly relevant to the District's fully
briefed estoppel claim.  See District MSJ 43-45; B.K. Resp. 8-10.  We
will consider these arguments in that context.
    [12] The thrust of the District's estoppel argument, pled as a
cause of action in its complaint in C.A. No. 11-6040, plainly sounds
in "promissory estoppel".  See Comm., Dep't of Pub. Welfare v. Sch.
Dist. of Philadelphia, 410 A.2d 1311, 1314 (Pa. Cmmw. Ct. 1980)
("promissory estoppel rests upon the promise to do something in the
future, whereas an equitable estoppel rests upon a statement of a
present fact"); District MSJ 44 ("From July 28, 2009 until B.K.
appeared to disavow the agreement in April 2010, the District
believed it had settled Parent's claims").  We construe the

no enforceable agreement exists.  See Crouse v. Cyclops Indus., 745 A.2d 606, 610 (Pa. 2000) (holding that the promissory estoppel doctrine applies only "[w]here there is no enforceable agreement between the parties because the agreement is not supported by consideration").

Curiously, the parties address the District's promissory estoppel claim as if it were relevant to our review of the hearing officer's July 2011 Decision.  This fundamentally misconstrues the estoppel claim.  The parties' submissions fail to apprehend that estoppel is an equitable doctrine that makes promises that are otherwise unsupported by consideration enforceable so as to avoid injustice.  The doctrine stops short of creating a contract governed by law -- the precise issue the hearing officer correctly resolved in her 2011 Decision.  Put another way, the estoppel issue was beyond the scope of our remand order.

Despite the parties' confusion about the relationship between the estoppel claim and our remand order, there is no doubt

---

District's argument in this manner notwithstanding its curious and imprecise citation, see, e.g., 11-6040 Compl. ¶ 70; District MSJ 43, to a case that addresses the distinct "equitable estoppel" doctrine. See Paul v. Lankenau Hosp., 543 A.2d 1148, 1153 (Pa. Super. Ct. 1988) (en banc), aff'd in part and rev'd in part on other grounds, 569 A.2d 346 (Pa. 1990) ("a plaintiff who attempts to recover upon a promise

that the District properly presented its estoppel claim to the

hearing officer below on at least two occasions.  Though the hearing

officer did not expressly entertain the District's estoppel

argument,[13] she implicitly found the District's estoppel argument to

be unavailing.  This conclusion follows from the legal reality that a

successful estoppel claim would have forced the hearing officer to

enforce B.K.'s promises to the district.  This course of conduct

would have mooted the FAPE issue.  In light of the parties'

presentation of this claim below, and the hearing officer's tacit

rejection of it, we conclude that the estoppel issue was exhausted

below.[14]  Before we turn to the merits of the District's estoppel

---

on the basis of estoppel need not attach any particular label to his
claim").
    [13] We cannot fault the hearing officer, a Doctor of
Psychology otherwise untutored in the law, for failing to appreciate
the admittedly subtle difference between the questions of whether a
contract exists as a matter of law and whether a promise should be
enforced as a matter of equity.  Indeed, counsel (actually tutored in
the law) cited misleading case law to her that overlooked the
equity/law distinction.
    [14] Again, we need not decide whether exhaustion is
jurisdictional or an affirmative defense because the parties either
waived the defense by failing to invoke it, or the futility exception
applies to excuse exhaustion whether it is jurisdictional or not a
waived defense.  To the extent exhaustion is an affirmative defense,
neither party challenged the exhaustion of this claim and thus they
waived any such challenge.  To the extent exhaustion is
jurisdictional or not waived, futility excuses this requirement in
the IDEA context.  See Honig v. Doe, 484 U.S. 305, 327 (1988); Beth

claim, we must first resolve the District's pending motion to supplement the record.

A.   Motion to Supplement the Record

The District filed a motion to strike portions of the administrative record, or, in the alternative, motion to supplement the administrative record.  In essence, the motion seeks to augment

---

V. by Yvonne V. v. Carroll, 87 F.3d 80, 88-89 (3d Cir. 1995); see also Coleman v. Newburgh Enlarged City Sch. Dist., 503 F.3d 198, 211 (2d Cir. 2007) (Straub, J., concurring) (recognizing futility as exception to exhaustion even if exhaustion were jurisdictional).  We can thus hold that it would be futile for us to remand the estoppel question back to the hearing officer.  I.K. is now twenty-years old and this litigation is entering its fifth year.  A final resolution of this matter has already been delayed due to procedural complexities in this case and a further delay would further deprive I.K. of his access to compensation that facilitates his access to educational opportunities.  We will thus excuse the exhaustion requirement here.  Pardini v. Allegheny Intermediate Unit, 420 F.3d 181, 192 n.13 (3d Cir. 2005) (construing district court's decision to reach the merits of an IDEA complaint prior to exhaustion as an invocation of the futility exception because the case was a "bewildering bureaucratic nightmare").

Moreover, where the issue before a court is a question of law like promissory estoppel, see Stonehedge Sq. Ltd. Partnership v. Movie Merchants, Inc., 685 A.2d 1019, 1024 & n.3 (Pa Super. Ct. 1996), and the record is fully developed, a specialized administrative hearing is of little utility.  See Pardini, 420 F.3d at 192 n.13 ("'Where the factual record is fully-developed and no evidentiary disputes remain, the court can and should decide legal issues.'" (quoting Octavia P. v. Gilhool, 916 F.2d 865, 869 (3d. Cir. 1990))); Ezratty v. Puerto Rico, 648 F.2d 770, 774 (1st Cir. 1981) (reasoning that the aims of exhaustion are inapplicable where "[t]he issue may be a pure matter of law as to which specialized administrative understanding plays little role").

the administrative record with the testimony of Judith Gran, Esq., B.K.'s original attorney in this matter.[15]  Though Gran testified at the administrative hearing, the District contends that her testimony was unjustly limited by her former client B.K.'s refusal to waive attorney-client privilege prior to, or at, the time Gran took the stand.  Only _after_ Gran concluded her testimony before the hearing officer -- and indeed had left the hearing -- did B.K. take the stand and "waive[] the attorney-client privilege specifically . . . as to [a] late September 2009 conversation".  Pl.'s Mtn. for Modif. at 2. The District contends that B.K.'s _volte face_ waiver of the privilege that only she controlled corrupted the administrative proceeding in

---

[15] Although we initially denied the District's motion as moot, see Apr. 29, 2013 Order, we reconsidered this decision in light of our view that our October 3, 2013 Scheduling Order was ambiguous and so we ultimately granted the parties leave to depose Judith Gran, Esq. and B.K.  In our May 9, 2013 Order we expressly reserved the question of whether we would "hear [this] additional evidence", 20 U.S.C. § 1415(i)(2)(c)(ii), when it came time for us to resolve the pending motions for summary judgment.  May 9, 2013 Order at ¶ (h); see also May 20, 2013 Order ¶ (c) (describing our May 9, 2013 Order as granting "limited relief" in that we only granted the right to depose a witness).  Our June 14, 2013 Order further recognized that, assuming we would hear this evidence, we could not engage in the requisite "modified de novo" review of the hearing officer's factual findings unless we could assess for ourselves the credibility of these witnesses through live testimony.  Id. at ¶ (e).  As noted, on August 5, 2013, we convened an evidentiary hearing to gather this evidence so that we could render credibility determinations in the event we decided to grant the District's motion.

that such sandbagging led the hearing officer to consider only her "one-sided testimony". Def. Mtn. to Supp. at 13. The record lacked "testimony . . . [of] each party's recollection of these conversations ", id. at 14, and, so the District's argument goes, and B.K.'s ambush of Gran fundamentally impaired the hearing officer's factual findings.

B.K., in response, argues that we should deny the District's motion because (1) Gran's testimony does not meet our Court of Appeals's standard for supplemental evidence in an IDEA case, (2) the District failed to recall Gran before the close of the administrative proceedings, and (3) the District failed to abide by the discovery timeline we set in our October 3, 2012 Scheduling Order.

We now conclude that it is essential to the full development of the factual record in this case -- not to mention our overarching truth-seeking duty -- that we supplement the administrative record with Gran's August 5, 2013 testimony about the September 28, 2009 conversation that she had with B.K. So as to ensure the fair development of this record, we will also augment the record with B.K.'s August 5, 2013 rebuttal testimony.

When Congress enacted the IDEA, it provided that "[i]n any action brought under this paragraph, the court . . . shall hear

additional evidence at the request of a party".  20 U.S.C. §

1415(i)(2)(c)(ii).  Our Court of Appeals has recently reaffirmed its

longstanding teaching that

> "'the question of what additional evidence to
> admit in an IDEA judicial review proceeding . . .
> should be left to the discretion of the trial
> court,' Susan N. v. Wilson Sch. Dist., 70 F.3d
> 751, 760 (3d Cir. 1995). . . . [A]ll a court must
> do is 'consider the party's request to admit
> additional evidence' and 'not summarily reject'
> it.  [D.K. v. Abington Sch. Dist., No. 08-4914,
> 2010 WL 1223596, at *4 (E.D. Pa. Mar. 25, 2010)
> (citing Susan N., 70 F.3d at 760).]  The district
> court should not automatically "'disallow
> testimony from all who did, or could have,
> testified before the administrative hearing,'"
> Susan N., 70 F.3d at 759-60 (quoting Burlington
> v. Dep't of Educ. for Mass., 736 F.2d 773, 790-91
> (1st Cir. 1984)), but the court need not consider
> evidence that is irrelevant or cumulative, see
> id. at 760.

D.K. v. Abington Sch. Dist., 696 F.3d 233, 253 (3d Cir. 2012).

The District's supplemental evidence unquestionably

satisfies our Court of Appeals's standard for record supplementation,

and we will grant its motion.  Gran's now unfettered-by-privilege

testimony about her September 28, 2009 conversation with B.K. is

crucial to the question of whether B.K.'s conduct supports a judicial

determination that B.K. is now estopped from avoiding certain

promises she made to the District in the absence of any binding

agreement.[16]  Gran's testimony is by no means cumulative of other

evidence already of record about the substance of B.K.'s statements

to her former attorney.  Indeed, B.K.'s sandbagging regarding the

attorney-client privilege fundamentally impaired the administrative

record.  For the first time at our August 5, 2013 evidentiary hearing

we learned what happened at this crucial juncture.  And this

information is critically useful to us because it profoundly

illuminates our determination of whether B.K. acted so as to lead the

District to reasonably believe that their dispute about I.K.'s

educational needs and related issues was resolved.

     B.K. contends that the District's failure to <u>re</u>call Gran at

the administrative hearing should bar it from supplementing the

record here.  As a threshold matter, B.K. makes an argument about the

procedure that the parties should have followed below but she fails

to direct us to any authority that governed those proceedings.  Even

more importantly, under the facts here -- where B.K. (1) refused to

waive, even to a limited extent, her attorney-client privilege with

Gran, (2) allowed Gran to testify subject to that privilege, and (3)

took the stand after Gran testified and left the hearing only to cast

_____

[16] Notably, B.K.'s relevancy argument focuses solely on the interplay
between Gran's testimony and the issue of the existence of a valid,

aside her privilege, thus (4) leaving the hearing officer with only
one side of the facts  --  without question prevented the hearing
officer from hearing <u>all</u> available evidence on which to make a
reasoned judgment.  Even if the District could have sought to recall
Gran before the administrative record was closed, the District's
procedural error pales against B.K.'s sandbagging that fundamentally
undermined the fairness of the proceedings.  Where Congress has
specifically vested us with the authority to hear additional evidence
not presented below -- and our Court of Appeals has rejected an
automatic rule that would disallow supplemental testimony from all
who already testified at an administrative hearing -- we will err on
the side of evidentiary inclusion and not self-fetter our duty to
find the truth.  See <u>Myers v. Cnty. of Orange</u>, 157 F.3d 66, 75 (2d
Cir. 1998) ("efficiency may normally be a legitimate interest, but
pursuing efficiency through policies which distort the truth-seeking
process is not").  Or, as Professor Ely trenchantly put it, ("[A]
procedural rule is . . . one designed to make the process of
litigation a fair and efficient mechanism for the resolution of
disputes.  Thus, one way of doing things may be chosen over another

---

enforceable settlement agreement, ignoring (yet again) the estoppel
issue.

because it is thought to be more likely to get at the truth, or better calculated to give the parties a fair opportunity to present their sides of the story, or because, and this may point quite the other way, it is a means of promoting the efficiency of the process." John Hart Ely, The Irrepressible Myth of Erie, 87 Harv. L. Rev. 693, 724-25 (1974) (internal footnotes omitted)).

We are also not swayed by B.K.'s argument that the District's failure to abide by the discovery timeline should foreclose the expansion of the record.[17]  We may have had a role in the confusion surrounding the admissibility of Gran's testimony and thus it would be unjust to allow any further impediment to making a complete record to thwart our truth-seeking here.  Our original Scheduling Order was arguably ambiguous given that the IDEA claims and discrimination claims asserted here are not normally resolved on congruent records.  To prevent any prejudice to the District that we may have played a role in creating here,[18] we will exercise our

---

[17] B.K.'s motion exposes some questions regarding the District's representations to us about its understanding of the scope of our Scheduling Order.  We decline B.K.'s invitation to sanction the District for its counsel's conduct by excluding evidence pertinent to the merits of this case.

[18] Our May 20, 2013 Order characterized our decision to reconsider our initial denial of the District's motion as one motivated by "the interests of justice".  May 20, 2013 Order ¶ (c). Here we seek to avoid unfair prejudice as well.

authority under Fed. R. Civ. P. 56(e)(1) to "give [the District] an opportunity to properly support or address the fact" of the September 28, 2009 conversation, a fact it could not "properly support" at the time it filed its motion.  District MSJ 13 n.10 (noting that "the substance of [the September 28, 2009] conversation is the subject of the District's pending motion to strike evidence").

   B.    The Merits of the Estoppel Claim

        The record having now been developed both by the hearing officer below and by us at the August 5, 2013 evidentiary hearing, we can at last review the hearing officer's tacit rejection of the estoppel argument because the District presses this argument again in its motion for summary judgment.  We apply the same modified <u>de</u> <u>novo</u> review standard described above.

        1.    The Promissory Estoppel Standard

The Pennsylvania Supreme Court has held that:

In order to maintain an action in promissory
estoppel, the aggrieved party must show that 1)
the promisor made a promise that he should have
reasonably expected to induce action or
forbearance on the part of the promisee; 2) the
promisee actually took action or refrained from
taking action in reliance on the promise; and 3)
injustice can be avoided only by enforcing the
promise.  As promissory estoppel is invoked in

> order to avoid injustice, it permits an equitable
> remedy to a contract dispute.

Crouse, 745 A.2d at 610 (internal quotation marks omitted).  As to

the first and second elements, the Pennsylvania Superior Court has

held that "[w]hen promissory estoppel is pled as a theory of

recovery, a cause of action will lie if the plaintiff relies on the

intentional or negligent representations of another party."  Thomas

v. E.B. Jermyn Lodge No. 2, 693 A.2d 974, 978 (Pa. Super. Ct. 1997).

Regarding the "avoid injustice" element, the Pennsylvania Supreme

Court has held that this is a fact-intensive inquiry:

> [s]atisfaction of [this] requirement may depend
> on the reasonableness of the promisee's reliance,
> on its definite and substantial character in
> relation to the remedy sought, on the formality
> with which the promise is made, on the extent to
> which the evidentiary, cautionary, deterrent and
> channeling functions of form are met by the
> commercial setting or otherwise, and on the
> extent to which such other policies as the
> enforcement of bargains and the prevention of
> unjust enrichment are relevant.

Thatcher's Drug Store of W. Goshen, Inc. v. Consolidated

Supermarkets, Inc., 636 A.2d 156, 160 (Pa. 1994) (alterations in

original) (quoting Restatement (Second) Contracts § 90, comment b).

"A party asserting a claim of [promissory] estoppel has the burden of

establishing all the essential elements", id., and it "may be invoked

only in those cases where all the elements of a true estoppel are

present, for if it is loosely applied any promise, regardless of the complete absence of consideration, would be enforceable." Stelmack v. Glen Alden Coal Co., 14 A.2d 127, 129 (Pa. 1940).

Here, the District has carried its burden of establishing its promissory estoppel, or detrimental reliance, as it stated this claim in paragraphs 69-71 of its 2011 complaint. Matarazzo v. Millers Mut. Grp., Inc., 927 A.2d 689, 692 (Pa. Commw. Ct. 2007).

## 2. Facts Relevant to the Estoppel Issue

Though the hearing officer's 2011 Decision included many findings of fact pertinent to our disposition of the estoppel claim, her cursory treatment of certain of the record facts, and repeated failure to reach the District's estoppel claim, fortifies our decision to revisit and augment her factual findings so that they can assist us in at last resolving the District's estoppel claim. We will now recite the hearing officer's findings of fact that are relevant to our resolution of this estoppel claim and, where necessary, we will augment these findings with citations to the administrative and newly-augmented August 5, 2013 record. All of our findings of fact are made pursuant to 20 U.S.C. § 1415(i)(2)(C),[19] see

------

[19] 20 U.S.C. § 1415(i)(2)(C) provides:

also Fed. R. Civ. P. 52(a)(1); Sebastian M. King Philip Regional Sch. Dist., 685 F.3d 79, 85 (1st Cir. 2012) ("in an IDEA case, a district court essentially conducts a bench trial based on a stipulated record" (internal quotation marks and alterations omitted)). We will differentiate our findings from the hearing officer's by affixing a letter to the numbered finding.

At the July 28, 2009 meeting,

*          *          *

    5.    Counsel for the District wrote down some basic settlement terms which had been discussed in the fashion described above. District counsel then read the terms discussed thus far, and Parent's counsel, who was the Parent's formal legal representative at the time, orally agreed to the terms. None of the participants signed the sheet of paper on which the terms were written.
    6.    The handwritten notes reflecting some basic items of the proposed agreement do not reflect that there was specific and detailed discussion about elements that would be put into a written agreement, such as a release of civil rights claims, a confidentiality provision, and

In any action brought under this paragraph, the court--
(i) shall receive the records of the administrative proceedings;
(ii) shall hear additional evidence at the request of a party; and
(iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

the necessity for the school board to ratify any agreement. Neither the Parent nor her former attorney recalled that conditions such as these were examined.

      7.    Believing the parties had come to an agreement in principle, counsel for both the District and the Parent spoke to Hearing Officer Myers on the telephone, asking that the hearing session be canceled and requesting 30 days to finalize the agreement. Hearing Officer Myers canceled the session and agreed to continue the matter for 30 days after which time, if he had not heard from the attorneys, he would dismiss the case. He confirmed this by email.

      8.    The Parent left the meeting not believing that there had been a settlement, and/or not being in complete agreement with the proposal.

            *       *       *

      13.    The process of crafting the settlement agreement continued well into the fall of 2009, with counsel for the parties exchanging various correspondences via e-mail and voicemail through August, September and October in which they refined the terms of these settlement agreement in consultation with their clients and exchanged annotated drafts. H1 Ex. 4.

            *       *       *

      13a.    Four drafts of a settlement agreement were sent to B.K. for her review: (1) an August 11, 2009 draft, H1 SD-5, (2) a September 21, 2013 draft, Aug. 5, 2013 NT 29:25-30:6, (3) a September 28, 2013 draft that B.K. "had approved in [the September 28, 2009] conversation" that she had with Gran on her sister's porch, id. at 27:2-9, 45:14-15, 46:25-47:16, and (4) a final October 15, 2009 draft embodying the District's final draft with only minimal changes to the document, H1 SD-11.

      13b.    The drafts recognized B.K.'s desire to homeschool her child, H1 NT at 241, and included in writing the financial terms and the

waiver/release provisions that both parties had, in principle, orally agreed to at the July 28, 2009 meeting. See H1 SD-9; H1 SD-11.

13c. Notably, the September 28, 2009 draft that Gran prepared after her porch meeting with B.K. evidences that she recommended (through counsel) a change to the release language. See August 11, 2009 Draft Agreement (H1 SD-5) §§ 3(c) & 4; September 28, 2009 Draft Agreement (H1 SD-9) §§ 3(c) & 4 (reflecting B.K.'s minor edits to the § 4 release language); Aug. 5, 2013 NT 20:1-13.

13d. At Gran's September 28, 2009 porch meeting with B.K., B.K. failed to mention anything to her attorney supporting the "discrimination" claims she brought for the first time in Civil Action No. 12-4066. Aug. 5, 2013 NT 30:15-24; 57:13-16.

13e. At no time between September 28 and October 15, 2009 did B.K. express any disagreement to Gran about the monetary and release terms Gran had negotiated in the draft she forwarded to the District and B.K. on September 28, 2009. Id. (Gran testifying that B.K. "did not ask that the settlement be changed to embody" her desire to refrain from waiving/releasing "civil rights claims"); id. at 47:23-24.

13f. On October 15, 2009, Habert, on the District's behalf, sent Gran a slightly revised version of the settlement agreement. The District's version made no changes to the § 3(c) release language and "accepted [B.K.'s] slight change [to the release language], and also specifically added the timeframe of release (from the beginning of time through the date of this agreement)." H1 SD-11 at 1.

13g. Gran and B.K. exchanged emails on October 15, 2009 when Habert had sent her the District's October 15, 2009 draft. Aug. 5, 2013 NT 50:7-18 (Gran testifying that she was able to recover email correspondences from her computer indicating that she had corresponded with the District's attorney and her client on that day

46

and her last correspondence with B.K. was on
October 21, 2009).

      *        *        *

14.    The Parent read various versions
of the proposed settlement agreement and there
were things in the documents that she thought she
would like to have changed; these things were
communicated to the District's attorney through
emails and voicemails.

      *        *        *

14a. B.K. did not express any
reservation about her homeschool demand or the
unchanged monetary terms and waiver/release
language from August 11, 2009 to at least March
of 2010.  See ¶ 21, infra.

      *        *        *

15.    However, the Parent never agreed
to sign any of the versions of the settlement
agreement [that were actually forwarded to her
for her signature.]

      *        *        *

15a.  B.K. agreed to all of the terms
embodied in the September 28, 2009 settlement
agreement that her attorney forwarded to the
District on her behalf.  Indeed, B.K. told her
counsel something on the order of "I'll sign the
settlement agreement [discussed on the porch on
September 28, 2009.]  Send me the papers that I
have to sign and I'll sign them."  Aug. 5, 2013
NT 27:3-5.

15b. That same night, following their
porch meeting and acting in reliance on B.K.'s
authorization, Gran sent to the District the
September 28, 2009 draft of the settlement
agreement that included the same homeschool,
financial, and waiver/release terms that B.K. had
registered no objection to at their meeting,
see also H1 SD-9.

      *        *        *

16.    On November 2, 2009 counsel for
the District inquired about the status of having
the agreement signed by the Parent, and on that

same date former counsel for the Parent replied that she had sent a copy of the agreement to the Parent for signature on October 15, 2009 and had not received a signed copy back yet.

17. On November 16, 2009 counsel for the District again inquired about the status of the agreement. H1 SD-14 at 1. There is no reply in the record from Parent's former counsel. Parent's former counsel left her agency on November 16, 2009.

18. From July 28, 2009 to December 7, 2009 neither the Parent nor her former counsel made the District's attorney aware that the Parent did not agree with the terms of the Settlement Agreement.

19. Meanwhile, counsel for the District believed that the Parent's claims had been settled.

20. On December 7, 2009 counsel for the District communicated with the director of PILCOP, the agency under whose auspices the Parent was represented, that she had learned that the Parent's former attorney had left the agency and asked that the newly assigned attorney contact her. The agency director responded that they were reviewing the file and that it would take several weeks to do so.

21. Counsel for the District and the new counsel for the Parent began communicating by telephone and email on December 8, 2009. Counsel engaged in reworking the settlement agreement as the Parent was objecting first to a clause relating to reversion of funds, and later to the amount of money Student would receive.

*       *       *

21a. As the hearing officer noted, B.K. did not register any objection to the monetary or release terms of the settlement agreement until many months after September of 2009. B.K.'s new attorney's January 25, 2010 letter made no effort to distance B.K. from the monetary or release terms of the agreement. H1 SD-17. Importantly, B.K.'s letter concedes that

48

"[t]he parties agreed upon the sum of $50,000 as compensatory education for [I.K.]." Id. at 2 of 2. At that time, the only point of disagreement was not the sum of the monies sought or the existence of a release but the existence of a "provision of reversion" that would remit any unspent residue of the $50,000 back to the District. Id.

     21b. Then, on March 9, 2010, B.K. filed a second administrative complaint. On March 30, 2010, B.K.'s position changed yet again when she informed the District that "[t]he problem [with B.K. signing a formal settlement agreement] appears to be the amount of funds". H1 SD-19 at 1 (emphasis added).

     21c. B.K. has not re-enrolled I.K. in a District school since March of 2009, H1 NT at 428:6-8 (B.K.'s testimony), and it was at the July 28, 2009 meeting that she first expressly requested to homeschool her child and the District agreed to her request. H1 NT 241; H1 SD-17.

### 3.  Revisiting Credibility And Factual Findings

We must first address a keystone issue of credibility that will drive our findings of fact and conclusions of law on the District's estoppel claim. At the hearing on August 5, 2013 there was, to be sure, a clash in the testimony of B.K. -- I.K.'s mother -- and her former counsel from PILCOP, Judith Gran, Esquire. But this credibility contest was not a close one.

For example, B.K. testified that Ms. Gran had not communicated with her, overlooking the uncontested fact that Ms.

49

Gran, frustrated at the mother's failure to respond to multiple emails and voicemails, took it upon herself to drive twenty-five minutes on the evening of September 28, 2009 to wait for the mother's return on the porch of the mother's sister's house. B.K.'s testimony as to her lawyer's failure to communicate is thus revealed, by Ms. Gran's undisputed actions that night, to be a fantasy at best.

Indeed, through her testimony Ms. Gran demonstrated that the impressive career described in her c.v. (Aug. 5, 2013 Def. Ex. 1) understates what a careful, methodical, and committed advocate she is for all her clients -- including I.K. and his mother. We therefore accept Ms. Gran's testimony in toto and reject as incredible the mother's contrary statements.[20]

Though our credibility determinations here are supplemented in part by the hearing officer's credibility determinations below, it bears noting that our rejection of B.K.'s testimony is in some

---

[20] It bears noting that since Ms. Gran's graduation from law school in 1983 she has with distinction represented children and adults with disabilities. Her August 5 hearing testimony demonstrated beyond any doubt that she served PILCOP well as Director of its Disability Project in the last eleven years of her twenty-five-year tenure at the Law Center. It therefore risks understatement to note that it was, at a minimum, eyebrow-raising when her successors at the Law Center allowed their client to throw this accomplished practitioner and PILCOP alumna under the bus (to say nothing about their fidelity to Pa. R. Prof. Conduct 3.3) after her exemplary service to I.K. and his mother.

tension with the hearing officer's views on this subject.  To the

extent that tension exists, we reject the hearing officer's

determinations and substitute our own.

In the hearing officer's 2011 Decision, she concluded that:

> This hearing officer holds with
> certainty that the former attorney for the
> District and the former attorney for the Parent
> were testifying truthfully, with precision, and
> insofar as their memories served them after
> nearly two years, with fidelity to their
> recollections of the events that unfolded.
>
>     *        *        *
>
> The mother offered credible testimony
> that she does not now believe, nor has she ever
> believed, that a settlement agreement exists.
> She persuaded this hearing officer that, at best,
> on the day of the resolution meeting and
> continuing thereafter she was deeply ambivalent
> about the considerations she was expected to
> extend under the proposed offer, particularly as
> they pertained to relinquishing her child's right
> to seek redress for perceived discrimination,
> balanced against the offer of a substantial sum
> of money that she could use for past and future
> educational expenditures for her child.  <u>Although
> logically it certainly would seem that a timely,
> firm, and clear rejection of the District's offer
> from the beginning would have been best and
> expected given the mother's concerns, it can only
> be surmised that ambivalence, and perhaps a sense
> of being overwhelmed, prevented the Parent from
> openly making her concerns known and resulted in
> her ultimately leaving the final proposed
> settlement draft unsigned.</u>

In certain instances that did not
materially undermine her credibility on the core
issue in this hearing, the Parent's statements
did not ring true, and these bear mentioning.
The mother said that she first contacted her
former counsel in July 2007, approximately two
years prior to her current attorney's filing the
due process complaint in June 2009, and that she
was "very concerned" about the delay.  Given the
clear concern she demonstrated for her child
through this proceeding, this hearing officer
cannot find her credible on this point,
especially as she had personal contact at IEP
meetings over this period with the lay advocate
from her former attorney's office.  [N.T. 379-
381, 413].  <u>Likewise, although the former
attorney for the District, the former attorney
for the Parent and the District's director of
special education all testified credibly that the
Parent was present in the room when the initial
terms of a proposed agreement were reviewed, the
Parent testified that she did not recall the
group going through the items.  [N.T. 399-400].
Although she was upset during that portion of the
resolution meeting, the existence of that degree
of disengagement from the discussion of
substantial financial considerations is very
difficult to accept.  [N.T. 414-415].</u>

2011 Decision 10-11 (emphasis added).

On a related note, the hearing officer found as fact that
"the Parent is unwilling to release the District from civil rights
claims and this position primarily underlies her rejection of the
proposed agreement."  H1 SD-4 (2011 Decision) at ¶ 23.

To be sure, the hearing officer's credibility
determinations and finding of fact noted above suggest that if B.K.

sincerely intended to preserve her right to pursue discrimination claims, the more "logical" plan would have involved a "timely, firm, and clear rejection of the District's offer from the beginning" so as to signal to others her subjective beliefs.  Id. at 11.  But because the hearing officer's credibility determination and finding of facts did not include the recently admitted September 28, 2009 conversation evidence we heard at the August 5, 2013 hearing because B.K. had ambushed Gran before her testimony and after Gran left the hearing, those determinations have now been superseded by the truth.

Thus, we find that B.K. in fact authorized Gran to communicate her acceptance of the money and waiver/release terms to the District on September 28, 2009.  B.K.'s direction to her attorney authorizing this affirmative representation to the District, the subsequent communications between the parties, and B.K.'s failure to raise any objection to these terms for nearly seven months fatally undermines the hearing officer's credibility determination of B.K. based on the corrupted and truncated record before her.

Moreover, we are especially unconvinced by B.K.'s testimony both before the hearing officer in 2011, H1 NT 411-412, and us at the August 5, 2013 hearing, Aug. 5, 2013 NT 63-64, that she told Gran at their September 28, 2009 meeting that B.K. would not sign away her

son's civil rights.  This contrasts with Gran's credible testimony that B.K. informed her that she would agree to the terms of a settlement as they had discussed it on the porch that night.  Ms. Gran's testimony is documented by the email she sent to the District's counsel that very night.  Aug. 5, 2013 Def. Ex. 3 (email sent 11:48 p.m. Sept. 28, 2009) (also appears in the administrative record at H1 SD-9).

As will be seen, as supplemented by the whole truth revealed on August 5, the hearing officer's reasoning confirms the District's promissory estoppel claim to the extent it suggests B.K.'s negligence in inducing the District to rely on her acceptance of key settlement terms.

### 4.  Analysis

As held above, we credit in toto Gran's testimony that B.K. authorized her to communicate to the District her promise to homeschool her child and accept the financial terms of the three draft agreements she reviewed in exchange for a waiver and release of all claims against the District.  Aug, 5, 2013 NT 20:5-11; 27:2-5. At bottom, the substance of B.K.'s "promise" is embodied in Gran's authorized September 28, 2009 draft sent to both B.K. and the District at about the same time.  Indeed, B.K.'s conduct confirmed

her adherence to the promise of home schooling her child. B.K. did not (and has not) sent I.K. back to the Haverford School District since March of 2009 -- throughout the pendency of the parties' discussions and lengthy periods of B.K.'s silence. B.K. expressed no concern about the waiver terms or the amount of money sought until nearly seven months after the July 28, 2009 meeting and only after new counsel took control of her case.

At bottom, B.K.'s words and deeds unambiguously communicated to the District that the negotiated terms were acceptable to her and her failure to register any objection for nearly seven months -- whether because she was ambivalent, negligent, or overwhelmed -- reasonably led the District to conclude, as the hearing officer found below, that the parties had resolved the case. Moreover, Gran's able counsel, and her good faith representations to the District, could have only fortified the District's reasonable belief that B.K. had agreed to the terms embodied in the draft agreements. Whatever motivated B.K.'s silence does not change the fact that it contrasted with her zeal for her son such that the District could only reasonably believe the matter had at long last resolved.

Second, the District here refrained from initiating truancy proceedings against plaintiff in reliance on B.K.'s promise to home school I.K. in exchange for money and a release of any claims against it. The District's correspondence demonstrates that it did not initiate any truancy action against the mother for failing to send I.K. to school after March of 2009 in reliance upon the eloquence of B.K.'s silence in this context. Indeed, the District, in fulfilling its duty to either approve a home school plan or initiate truancy proceedings against I.K, inquired as to B.K.'s intentions regarding settlement in November 16, 2009 -- nearly four months after the July 28, 2009 meeting. H1 SD-14 at 1 (The District's attorney, Natalie Habert's November 16, 2009 email Ms. Gran) ("I am . . . concerned because [I.K.] has not attended school in the District since his mother withdrew him last spring, but [B.K.] has neither filed a home school plan for approval by the District nor signed the written Settlement Agreement to allow funding of the Special Education Trust. I appreciate hearing from you on this at your earliest convenience, so that the District can make a decision about whether it is compelled to investigate [I.K.'s] absence from school under the obligations placed upon it by the school attendance and truancy laws.").

Pennsylvania's compulsory education law, 24 Pa. Stat. § 13-1333(a)(1), provides, in part, that:

> Every parent, guardian, or person in parental relation, having control or charge of any child or children of compulsory school age, who shall fail to comply with the provisions of this act regarding compulsory attendance, shall on summary conviction thereof, be sentenced to pay a fine, for the benefit of the school district in which such offending person resides, not exceeding three hundred dollars ($300) and to pay court costs or be sentenced to complete a parenting education program offered and operated by a local school district, medical institution or other community resources, and, in default of the payment of such fine and costs or completion of the parenting program by the person so offending, shall be sentenced to the county jail for a period not exceeding five (5) days.

Section 13-1333(d) further provides that "[n]othing in this section shall be construed to apply to a parent, guardian or person in parental relation whose child or children are in a home education program under section 1327.1." School districts are also "responsible for administering the individual school systems and, to that end, may adopt such reasonable rules and regulations as are necessary and proper for the management of school affairs", including truancy policies. See Pennsylvania v. Hall, 455 A.2d 674, 676 (Pa. Super. Ct. 1983).

Thus, if B.K. was not educating her child under 24 Pa. Stat. § 13-1327.1 as she claimed to want to do as early as the July 28, 2009 meeting -- and in fact appeared to be doing since March of 2009 -- she risked "fail[ing] to take reasonable steps to ensure her child's attendance at school", United States v. Jackson, 169 F. App'x 120, 122 (3d Cir. 2006) (citing § 13-1333), and thereby exposed herself to § 13-1333 sanctions. See also 24 Pa. Stat. § 13-1327(d) (obliging parents of children subject to the IDEA who are homeschooling their children to proceed according to an approved "program" or risk violating the compulsory education law).

When the District relied on B.K.'s failure to send I.K. to its schools, it exposed itself to the risk the Commonwealth would hold it was shirking its obligations to "to maintain a thorough and efficient system of public education." Hall, 455 A.2d at 411 (internal quotation marks and citations omitted). The Act of March 10, 1949, P.L. 30, of which § 13-1333 is a part, imposes penalties on "[a]ny district superintendent, secretary of the board of school directors, attendance officer, or teacher of any public . . . school . . . who willfully refuses or neglects to comply with the provisions of this act". 24 Pa. Stat. § 13-1355. More pungently, the Pennsylvania Secretary of the Department of Education can withhold the Commonwealth's appropriations to school districts that fail to

comply with their obligations under the compulsory education act.
See 24 Pa. Stat. § 13-1357; cf. Pennsylvania v. Edsall, 13 Pa. D 509,
1903 WL 2585, at *3 (Ct. of Quarter Sessions of the Peace of PA 1903)
(noting that an ancestor compulsory education law "gives notice that
part of the state appropriations are to be withheld from school
districts that do not enforce its provisions") (emphasis in
original).  Thus, the District imperiled state funding for its
educational programs if it without ground relied upon B.K.'s
representations that I.K. would be homeschooled -- to say nothing of
exposing District officials to personal liability.  Of course, the
District offered a $50,000 subsidy for I.K.'s homeschooling and
agreed to reimburse B.K. for $4,000 more.

Finally, we avoid injustice here only if we enforce B.K.'s
promise to accept the homeschool, money, and release terms here.
"Congress' central goal in enacting the IDEA was to ensure that each
child with disabilities has access to a program that is tailored to
his or her changing needs and designed to achieve educational
progress", Susan N. v. Wilson Sch. Dist., 70 F.3d 751, 760 (3d Cir.
1995) (internal quotations omitted).  Here, enforcing B.K.'s
representations to the District will ensure that I.K. is finally
provided with the funds from which B.K. can tailor her son's

59

educational needs as B.K. deems fit (and as she demanded at the July 28, 2009 meeting). I.K. has not returned to the District since March of 2009, and the settlement funds B.K. will secure if she is estopped from denying her promises to the district will be available to fund a wide array of educational services to meet I.K.'s needs.

We also do not find that enforcing B.K.'s promises would work an injustice to B.K. herself under these circumstances because her interests, as the complaint's caption suggests, are secondary to her son's. Though we are sympathetic to the challenges this mother faces in educating her special needs child, the principles of justice are only advanced under the IDEA if we hold her accountable for her promises to a publicly-funded school district that guarantees generous sums to fund a special needs child's education.

Moreover, the enforcement of B.K.'s promise avoids the substantial injustice that would befall the District as a result of its reasonable reliance on that promise. Months went by in 2009 and 2010 without B.K. (or either of her two attorneys on her behalf) registering objection to the homeschooling, financial, and waiver/release terms in the agreement drafts that the parties exchanged on at least four occasions in August, September, and October of 2009. B.K.'s silence about her intention to sign the agreement (or not), in the face of the District's repeated inquiries,

and her decision not to send I.K. back to the District schools in the interim, gave the District the unambiguous reasonable view that the matter was resolved.  To allow B.K.'s late-in-the-game change of heart to prevail over the District's earnest efforts to resolve this matter -- and to equip B.K. with significant funds to educate I.K. -- would thwart the District in its good faith effort to compromise with B.K. to resolve the IDEA claims.  Cf. D.R. by M.R. v. E. Brunswick Bd. of Educ., 109 F.3d 896, 901 & n.3 (3d Cir. 1997) (holding that when parties voluntarily agree to settle claims, and, as here, "there is no contention . . . that the settlement agreement violated federal law", the agreement will be enforced because "a decision that would allow parents to void settlement agreements when they become unpalatable would work a significant deterrence contrary to the federal policy of encouraging settlement agreements").

Consequently, although there is no valid settlement agreement between the parties, the District is entitled to summary judgment on its promissory estoppel claim because B.K.'s words and deeds in 2009 and 2010 led it reasonably to believe and act as if the parties had resolved their dispute and agreed to terms and waiver/release of certain claims.

Although no enforceable <u>contract</u> existed, our conclusion

that B.K. is estopped from avoiding her promises to the District

"implies a contract in law where no contract exists in fact", 28 Am.

Jur. Estoppel and Waiver § 54 n.7 & accompanying text (2d ed. current

through Aug. 2013).  Our enterprise of identifying B.K.'s promises to

the District is made easier by the existence of contractual language

upon which the parties acted in reliance, and it is to this language

that we will soon turn.[21]

---

[21] B.K. does not claim that the parties entered into an
enforceable contract at any time and the District has not properly
raised any claim that a post-July 2009 contract was formed.  To the
extent the issue was not waived, however, because the District's
School Board only retroactively approved certain terms of a
settlement agreement once B.K. expressed her opposition to the terms
of the settlement, the School Board at most accepted a revoked offer
and the District-offeree's ability to accept that agreement lapsed.
<u>See</u> <u>Step Plan Services, Inc. v. Koresko</u>, 12 A.3d 401, 408-09 (Pa.
Super. Ct. 2010).  Because no enforceable contract would exist in
this event, the District's promissory estoppel claim survives.  <u>See</u>
<u>Fried v. Fisher</u>, 196 A. 39, 41-42 (Pa. 1938) ("the phrase 'promissory
estoppel,' and this nomenclature is well chosen as indicating that
the basis of the doctrine is not so much one of contract, with a
substitute for consideration, as an application of the general
principle of estoppel to certain situations".)  To the extent the
District claims public entities may retroactively ratify contracts,
<u>see</u> District MSJ Reply 7, we need not reach that issue here because
B.K.'s offer to contract was effectively withdrawn before the
contract could be ratified, but not before she could be estopped from
avoiding her promises.

VII. B.K.'s Discrimination Claims and
    The District's "Release" Affirmative Defense

    The District contends that an enforceable waiver and
release mandate summary judgment in its favor on B.K.'s
discrimination claims.  B.K. did not respond to this argument.
Though we cannot grant summary judgment motions as uncontested, see
Loc. R. Civ. P. 7.1(c), we will reach the merits of the District's
motion here and grant it on the basis of the District's affirmative
defense.  Because the District cited the waiver and release as
affirmative defenses to B.K.'s federal discrimination claims, and,
for the reasons expressed above we will estop B.K. from avoiding her
promise to waive/release those claims here.

    Our Court of Appeals has summarized the jurisprudence
regarding summary judgment by noting that it "should only be granted
if 'there is no genuine dispute as to any material fact.'  Fed. R.
Civ. P. 56(a).  A dispute is "genuine" if a reasonable trier-of-fact
could find in favor of the non-movant.  A dispute is material if it
could affect the outcome of the case.  In considering the record, we
must draw all reasonable inferences in favor of the non-moving
party."  Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294,
300 (3d Cir. 2012) (internal citations omitted).

Pennsylvania law recognizes a release of claims as an affirmative defense.  See, e.g., Pa. R. Civ. P. 1030 (listing "release" and "waiver" as affirmative defenses); Blumenstock v. Gibson, 811 A.2d 1029, 1039 (Pa. Super. Ct. 2002).  For releases to be enforceable they must be "clear and unambiguous" and the language must "be specific and particular to the legal rights" subject to waiver.  Ecksel v. Orleans Construction Co., 519 A.2d 1021, 1025 (Pa. Super. Ct. 1987).  Moreover, "[e]vidence that the parties actually negotiated the release will tend to indicate that the purchaser made a knowing waiver of his or her rights."  Id.  We are to apply "traditional contract principles to releases, including the policy of effectuating the intention of the parties via enforcement of the ordinary meaning of release terms."  Maloney v. Valley Medical Facilities, Inc., 984 A.2d 478, 481 (Pa. 2009); Clark v. Philadelphia College of Osteopathic Medicine, 693 A.2d 202, 207 (Pa. Super. Ct. 1997).  Of course, the interpretation of a contract is a question of law.  See Consolidated Rail Corp. v. Del. River Port Auth., 880 A.2d 628, 631-32 (Pa. Super. Ct. 2005).

B.K. has not cited any material differences between the September 28, 2009 settlement agreement draft that Gran prepared after their porch conversation and the October 15, 2013 draft that the District returned to Gran and that Gran forwarded to B.K.  We

64

will therefore focus on the parties' most recent iteration of the unobjected-to relevant release language. That language constitutes "clear and unambiguous" language that applies to a specified range of education-related claims.

Section 3C of the October 15, 2009 draft provided:

> PARENTS expressly agree to waive any rights the STUDENT might otherwise have had to obtain a free, appropriate public education (FAPE) from the DISTRICT, through August 31, 2010, and to waive any rights the STUDENT might otherwise have had to obtain an evaluation from the DISTRICT, have the DISTRICT develop an Individualized Education Program (IEP) for the STUDENT, have the DISTRICT monitor the STUDENT's progress, and/or obtain services from the DISTRICT, through August 31, 2010. PARENTS expressly waive any further obligations of the DISTRICT towards the STUDENT or PARENTS based upon STUDENT'S status as a DISTRICT resident of school age, as an eligible student under the IDEA, as a protected handicapped student under Section 504 of the Rehabilitation Act, or as a person in anyway entitled to receive educational programming from the DISTRICT, through August 31, 2010, except for the funding set forth in Paragraph 2 above and except for the approval required pursuant to Pennsylvania's Home Education law, 24 P.S. § 13-1327.

H1 SD-11 at 4 of 7.

Section 4 of the October 15, 2009 draft provided:

4. <u>Release</u>

A. PARENTS, on their behalf and on behalf of STUDENT ("the FAMILY"), hereby completely

65

release, remise and forever discharge the
DISTRICT, its directors, administrators,
employees, attorneys, agents, servants,
representatives, contractors, insurers,
predecessors, successors and assigns ("the
RELEASED ENTITIES"), of and from any claims or
demands of any kind, arising from the beginning
of time through the date of this AGREEMENT, which
the Family, its members, heirs, executors,
administrators, successors, representatives,
contractors and assigns or anyone claiming
through, by or on behalf of the Family may have,
including but not limited to any EDUCATION CLAIMS
(defined as: claims under the Individuals with
Disabilities Education Act, Section 504 of the
Rehabilitation Act, the Americans with
Disabilities Act, and their implementing
regulations; claims under the Pennsylvania School
Code and its implementing regulations, including
22 Pa Code Chapters 14 and 15; claims arising out
of, by reason of, in connection with or as a
result of STUDENT's status as a DISTRICT resident
of school-age and any obligation of the RELEASED
ENTITIES to the FAMILY arising from that status;
claims arising from the RELEASED ENTITIES'
providing or failing to provide educational or
related services to STUDENT; and claims of the
FAMILY for educational or related services,
support services, educational expenses, tuition
reimbursement, evaluations and/or assessments,
compensatory education, damages, discrimination
against STUDENT or PARENTS, and attorney and
witness fees and/or costs) that the FAMILY raised
or could have raised in [this matter], or in any
other action (the "RELEASED CLAIMS"). In Re
I.K., ODR No. 10206 08-09.

B.  The FAMILY hereby completely releases,
remises, and forever discharges the RELEASED
ENTITIES of and from any EDUCATION CLAIMS,
including the obligation to provide educational
services to STUDENT, through August 31, 2010 and
until such time as PARENTS reenroll STUDENT in

the DISTRICT as set out in paragraph 3 of this
AGREEMENT, including specifically any EDUCATION
CLAIMS arising after the date of this AGREEMENT.

C.  The intent of the PARTIES to this AGREEMENT
is to extinguish and end any and all possible
future liability and obligations of the RELEASED
ENTITIES to the FAMILY which may be in any way
related to EDUCATION CLAIMS, including the
obligation to provide educational services to
STUDENT through August 31, 2010 and subsequent to
August 31, 2010 unless and until PARENTS reenroll
STUDENT in the DISTRICT, regardless of the source
of that obligation, except for the obligation to
make payments under Paragraph 2 of this Agreement
and except for the approval required pursuant to
Pennsylvania's Home Education law, 24 P.S. § 13-
1327, for the 2009-2010 school year.

Id. at 4-5 of 7.

Four prefatory points are warranted here.  First, B.K.
cannot complain that our "enforcement by estoppel" of her promise to
waive/release certain claims exceeds our limited subject matter
jurisdiction as a federal court.  The parties do not dispute that a
federal district court's enforcement of anything tantamount to an
IDEA settlement agreement ordinarily exceeds the scope of federal
jurisdiction absent an independent basis for federal jurisdiction.
See L.M. v. Lower Merion Sch. Dist., No. 10-4855, 2011 WL 71442, at
*3 (E.D. Pa. Jan. 7, 2011) (Bartle, J.) (collecting cases).  We have
an independent basis for federal jurisdiction to "enforce" this
agreement here because the District raises the enforceability of the

waiver/release provisions as an affirmative defense, not as a direct enforcement action, and we have jurisdiction over B.K.'s federal discrimination claims pursuant 28 U.S.C. § 1331.

Second, B.K. cannot complain that our estoppel holding as it relates to the waiver/release agreement works an injustice in light of the District's failed attempt to satisfy the majority school board vote requirement, 24 Pa. Stat. § 5-508.  Although the positive law bar to the enforceability of any contract is something that the Pennsylvania courts warn contracting parties to avoid, the concerns that animate those opinions are absent here because the District seeks to honor, not disclaim, its obligations under the draft agreements it exchanged with B.K.  Our Court of Appeals has also recognized that the Supreme Court of Pennsylvania has held that "'[a]lthough it is the general rule that estoppel against the government will not lie where the acts of its agents are in violation of positive law, . . . this rule cannot be slavishly applied where doing so would result in a fundamental injustice.'"  Wayne Moving & Storage of N.J., Inc. v. Sch. Dist. of , 625 F.3d 148, 156 (3d Cir. 2010) (quoting Chester Extended Care Ctr. v. Pennsylvania Dep't of Pub. Welfare, 586 A.2d 379, 383 (Pa. 1991)).  This is exactly the situation here.  To be sure, parents and public school districts alike may both find themselves on the losing side of a promissory

estoppel claim.  Put another way, the District cannot invoke promissory estoppel and then attempt to hide behind § 5-508 in every circumstance to shield itself from such a claim.

Third, the law of the case doctrine "bars courts from reconsidering matters actually decided", especially since our findings were based on a fully developed and augmented record that exhaustively explored all relevant factual issues.  Council of Alternative Political Parties v. Hooks, 179 F.3d 64, 69 (3d Cir. 1999).  When "a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case", especially where the court decides the issue upon a fully-developed record and is authorized by statute to do so under the federal law that is at the heart of the dispute.  Arizona v. California, 460 U.S. 605, 618 (1983); Naser Jewelers, Inc. v. City of Concord, N.H., 538 F.3d 17, 20 (1st Cir. 2008) ("Narrow exceptions to the doctrine exist if the initial ruling was made on an inadequate record or was designed to be preliminary; if there has been a material change in controlling law; if there is newly discovered evidence bearing on the question; and if it is appropriate to avoid manifest injustice.").

As evidenced by our findings of fact on the estoppel issue that Congress has authorized us to render, we have concluded that B.K. made changes to the waiver and release provisions through her counsel thereby altering the contractual language to her terms. Moreover, B.K. herself waited for nearly seven months before expressing any concern about the waiver/release provisions. Indeed, we found that B.K. expressed no disagreement with her counsel's release-language. This "indicat[es] that [B.K.] made a knowing waiver of . . . her rights." See Ecksel, 519 A.2d at 1025.

With these threshold considerations in mind, we turn to the heart of the question of contract law before us. B.K.'s complaint in Civil Action No. 12-4066 asserts: (1) a denial of a FAPE for the 2012-2013 and 2013-2014 school years, (2) a Section 504 claim alleging that the District (a) refused to provide I.K. with school books, (b) improperly disciplined him during late February 2009, (c) failed to take action in response to a claim that I.K. was bullied at his bus stop by non-disabled peers, and (d) refused to provide I.K. with any new IEP after March of 2009, and (3) an Americans with Disabilities Act claim coextensive with the section 504 claim.

In light of the waiver/release provision language quoted above, there can be no doubt that B.K.'s claims raised in Civil Action No. 12-4066 fall within the scope of sections 3C, 4A, and 4B

of the October 15, 2009 draft that we have held her to be estopped from disclaiming.  Consequently, the waiver/release provisions preclude B.K. from asserting the claims she brings against the District here.

As to the FAPE claims raised in part (d) of B.K.'s Section 504 and ADA claims related to the 2009-2010 school year, and the hearing officer's FAPE determinations that B.K. sought to appeal in her motion for judgment on the administrative record, Section 3C "waive[s] any rights the STUDENT might otherwise have had to obtain a free, appropriate public education (FAPE) from the DISTRICT, through August 31, 2010, and . . . waive[s] any rights the STUDENT might otherwise have had to obtain an evaluation from the DISTRICT, [and] have the DISTRICT develop an Individualized Education Program (IEP) for the STUDENT . . . through August 31, 2010."  Since these IDEA and discrimination claims fall within the plain language of this provision, B.K. is barred from asserting those claims here.  H1 SD-11 at 4 of 7.

As to B.K.'s 2012-2013 and 2013-2014 IDEA claims, her right to bring these claims is foreclosed by her estopped-from-avoiding release of claims against the District for any failure to "provide educational services to STUDENT, through August 31, 2010 and

until such time as PARENTS reenroll STUDENT in the DISTRICT . . .,
including specifically any EDUCATION CLAIMS arising after the date of
this AGREEMENT", where such claims include the "fail[ure] to provide
educational or related services to STUDENT", and for "claims . . .
for educational or related services, . . ., evaluations and/or
assessments".  H1 SD-11 at 5 of 7 (emphasis added)  (Sections 4A and
4B).  As noted above, I.K. has not re-enrolled I.K. in a District
school since March of 2009, and since these claims accrued long after
the conduct that estops B.K. from denying her promise to settle the
underlying due process complaint, the Section 4 release terms bar her
from continuing those causes of action.  Moreover, because B.K.
should have brought her son's February of 2009 discipline-related
claim in the first 2009 due process complaint but failed to do so,
Section 4A precludes her from asserting that claim now.

And regardless of the time B.K.'s school books and bullying
claims accrued, the waiver/release provisions unequivocally bar her
from bringing any "EDUCATION CLAIMS" "arising from the beginning of
time through the date of this AGREEMENT", H1 SD-11 § 4A, and "any
EDUCATION CLAIMS arising after the date of this AGREEMENT", id. § 4B,
where "EDUCATION CLAIMS" are defined as section 504 and ADA claims
that "arise[] out of, by reason of, in connection with or as a result
of STUDENT's status as a DISTRICT resident of school-age and any

72

obligation of the RELEASED ENTITIES to the FAMILY arising from that status". Id. at § 4A. Because these claims presuppose that I.K.'s Section 504 and ADA rights flow from the District's duties as the default provider of educational services absent a home schooling agreement (as exists here), these claims also fall within the release's heartland.

B.K. is therefore estopped from avoiding her waiver and release of all claims at issue here in the implied contract we have found to exist pursuant to the District's promissory estoppel claim for relief. The District is therefore entitled to summary judgment in its favor on B.K.'s discrimination claims. Because we need not reach the merits of B.K.'s discrimination claims, we will deny as moot her motion for partial summary judgment.

And in light of our enforcement by estoppel of these waiver/release terms, we must deny as moot B.K.'s motion for partial summary judgment on her waived and/or released discrimination claims and deny as moot plaintiff's motion for judgment on the administrative record because she waived those claims. We must also vacate the hearing officer's 2012 decision because there was no need for the hearing officer to engage in any FAPE determinations because

B.K. is estopped from avoiding her waiver/release of her FAPE claims here.

VIII.  <u>Conclusion</u>

We will thus grant in part and deny in part the District's motion to supplement the administrative record and motion for summary judgment.  We hold that although no valid settlement agreement existed between the parties, the District has succeeded on its equitable claim that promissory estoppel makes B.K.'s promises to settle I.K.'s IDEA and discrimination claims enforceable under the record as augmented.

We also conclude that the District is entitled to summary judgment on the basis of waiver and release, the affirmative defenses it pled in its answer to B.K.'s complaint in C.A. No. 12-4066.  We therefore affirm the hearing officer's 2011 Decision but vacate her 2012 Decision in its entirety.  Because we conclude that B.K. has waived and/or released the District from liability for the IDEA and discrimination claims she advances in her complaint, we will deny as moot B.K.'s motion for judgment on the administrative record and motion for partial summary judgment on the discrimination claims.

BY THE COURT:

<u>/S/ STEWART DALZELL, J.</u>